CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 04 2019

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER IDS 100013320995708, CESAR.PARRA.96199344, AND CHUYJG1 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | **SEALED**<br><br>Case No. 7:19 mj-19 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Samantha DeNardis, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Special Agent with the Drug Enforcement Administration, and have been since 2005. I am currently assigned to Enforcement Group 25, Roanoke Resident Office (RRO), of the DEA Washington Division Office. I have received training in all areas of narcotics investigations including search and seizure laws and statutes pertaining to enforcement of the

Controlled Substances Act. Since becoming a federal law enforcement officer in 2005, I have either conducted or assisted other law enforcement officers in conducting numerous narcotics investigations that have resulted in the arrest and conviction of numerous individuals.

3. I have attended classes and courses conducted by the DEA regarding the importation, transportation, and distribution of illegal drugs. I am knowledgeable about state and federal drug laws. I have participated in a number of drug trafficking, money laundering, and organized crime investigations that have resulted in the arrest of numerous members of several different international and domestic drug trafficking organizations (DTOs) and the seizure of currency, assets, and drugs. Several of these investigations have employed electronic surveillance as an investigative technique, and I have submitted Federal and state affidavits in support of applications for court orders authorizing the use of wiretaps and other forms of electronic surveillance. I have participated in many searches of residences and businesses of suspected drug traffickers for evidence of criminal activity. I have also conducted and participated in the debriefing of many drug traffickers and money launderers, through which I have learned valuable information regarding the techniques used by DTOs to distribute drugs in both domestic and international markets. Additionally, I have testified in grand jury proceedings related to the investigation of individuals involved in drug trafficking and money laundering. As a result of my training and experience, I am familiar with the way in which DTOs illegally traffic, transport, and distribute drugs and launder the proceeds derived from their drug distribution activity.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846, conspiracy to distribute cocaine, violations of 21 U.S.C. § 841, distribution of cocaine; and violations of 21 U.S.C. § 843(b), offenses involving the use of communications facilities in commission of narcotics offenses, have been committed by Cesar GONZALEZ-Parra, and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

6. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for the target Facebook accounts, it is not intended to include each and every fact and matter observed by me or known to the government. Therefore, I have set forth only those facts necessary to support probable cause for this application.

7. This affidavit is made in support of a SEARCH WARRANT to search the FACEBOOK accounts named "Cesar Parra Rancho San Antonio", ID number **100013320995708**; "Cesar Parra", ID number **chuyjg1**; and "Cesar González Parra", ID **cesar.parra.96199344**.

8. Since March 2015, the DEA RRO has investigated a DTO operating in the Martinsville, Axton, and Danville, VA area that is responsible for the distribution of significant amounts of cocaine, methamphetamine, heroin, and marijuana. This DTO is operated by members and affiliates of the Jalisco New Generation Cartel (CJNG), a Mexican-based criminal organization controlling the large majority of cocaine and methamphetamine trafficking in southern and western Mexico. Based on the DEA RRO and affiliated DEA investigations, CJNG

has recruited individuals from the regions of Jalisco, Nayarit, and Veracruz to distribute drugs in areas of the Western District of Virginia, including Axton, Virginia.

9. In July 2015, Cesar GONZALEZ-Parra was identified through the investigation as being involved in the distribution of cocaine in the areas of Martinsville, Axton, and Danville, VA.

10. In March 2016, the Pittsylvania County Sheriff's Office conducted a traffic stop on a vehicle being operated by GONZALEZ-Parra. GONZALEZ-Parra granted consent to search the vehicle. During a consensual encounter with a passenger, investigators located a small amount of suspected cocaine and over $9,000 in United States Currency (USC). Investigators subsequently seized the vehicle and all cellular telephones, which included a cellular telephone belonging to GONZALEZ-Parra. A state search warrant was executed on the cellular telephone of GONZALEZ-Parra, which revealed pictures of kilogram quantities of suspected cocaine, a money counting machine, and bulk amounts of USC.

11. In February 2018, the DEA RRO, the DEA Winchester Residence Office (WRO), and the FBI Martinsburg Resident Agency conducted a total of 12 federal search warrants in the Western District of Virginia, targeting locations associated with large-scale cocaine trafficking by the CJNG DTO. During the search of several residences located in Axton, Virginia, and Winchester, Virginia, and the simultaneous interception of a drug shipment leaving Axton, law enforcement recovered 12 kilograms of cocaine, over $100,000 in USC, and several firearms. Surveillance conducted by law enforcement in the months leading up to the execution of the search warrants documented several other coconspirators at these same locations conducting drug transactions. Several DTO members were arrested on federal drug trafficking charges in the Western District of Virginia and the Northern District of West Virginia.

12. In May 2018, law enforcement in North Carolina intercepted the delivery of three kilograms of heroin during a traffic stop. The driver fled the scene on foot, leaving behind the drugs and a cell phone. A subsequent search of that phone revealed recordings of audio messages transmitted the day prior to and the day of the traffic stop between the driver and GONZALEZ-Parra, discussing GONZALEZ-Parra's delivery of cocaine to the same location arranged for the transfer of heroin by the driver.

13. In July 2018, a Federal search warrant was executed at the residence of GONZALEZ-Parra after the controlled delivery of approximately 15 pounds of suspected marijuana. The search revealed drug ledgers documenting the distribution of over 139 kilograms of suspected cocaine dating back to 2017, which was valued at over $4,000,000 USC. Law enforcement also recovered a money counting machine and firearms.

14. In December 2018, I participated in an interview of a source of information (SOI) who provided information regarding the DTO under investigation. During the interview, the SOI provided information regarding the cocaine trafficking activities of Cesar GONZALEZ-Parra in the Axton, VA area. The SOI stated GONZALEZ-Parra was responsible for the distribution of multi-kilogram quantities of cocaine and multi-pound quantities of marijuana.

15. The SOI stated that GONZALEZ-Parra was in contact with Missael Espinoza through Facebook Messenger. Missael Espinoza has been subsequently identified as Eustaquio Missael ESPINOZA-Ayon. The SOI stated ESPINOZA-Ayon contacted GONZALEZ-Parra through Facebook Messenger to offer GONZALEZ-Parra with a large quantity of cocaine because ESPINOZA-Ayon's uncle was able to ship 100 kilograms of cocaine to Burlington, NC. The SOI saw the content of these Facebook Messenger messages between GONZALEZ-Parra and ESPINOZA-Ayon.

16. The SOI stated that he/she witnessed a telephone call placed by ESPINOZA-Ayon at the residence of GONZALEZ-Parra in which ESPINOZA-Ayon called his uncle to come to an agreement on a price for cocaine to supply GONZALEZ-Parra. The SOI further stated that GONZALEZ-Parra would not agree to the price because it was too high.

17. I further learned of an investigation that was conducted by the DEA Columbia District Office (CDO) which involved the execution of a Federal search warrant in November 2012 in Cassatt, South Carolina, the seizure of over $400,000 USC, the arrest of Adolfo HERNANDEZ-Quintanilla for conspiracy to distribute more than five kilograms of cocaine, and the arrest of Paulo ESPINOZA-Ruiz for possession of a firearm and ammunition by a prohibited person.

18. During the DEA CDO operation, agents and investigators encountered ESPINOZA-Ayon, who had fled the location of the search warrant with HERNANDEZ-Quintanilla and was later located at a different residence. During the detention of ESPINOZA-Ayon, he stated that he came to the United States after being randomly kidnapped in Magdalena, Jalisco, Mexico by the Jalisco New Generation Cartel. ESPINOZA-Ayon stated he was held for approximately eight months and was released after a ransom was paid. ESPINOZA-Ayon claimed to not know that his father, ESPINOZA-Ruiz, was involved in drug trafficking. (ESPINOZA-Ruiz later pled guilty to conspiring to distribute more than five kilograms of cocaine.) ESPINOZA-Ayon further stated he was living at the same residence as his father in Cassatt, SC and he was living in the United States illegally after overstaying his visa. ESPINOZA-Ayon was also found in possession of four cellular telephones. Based on my training and experience, this is indicative of drug trafficking.

19. I identified a Facebook profile for GONZALEZ-Parra, with the user name Cesar Parra Rancho San Antonio and Facebook User ID 100013320995708, which showed GONZALEZ-Parra as being friends with "Missael Espinosa," believed to be the Facebook account for ESPINOZA-Ayon. I also identified two additional Facebook profiles for GONZALEZ-Parra, with the user names: Cesar Parra, Facebook User ID number chuyjg1, and Cesar González Parra, Facebook User ID cesar.parra.96199344. A preservation request was submitted to Facebook on December 17, 2018 for Facebook User IDs 100013320995708, chuyjg1, and cesar.parra.96199344.

20. Based upon the information outlined in this affidavit, I believe that GONZALEZ-Parra utilizes the Facebook Accounts "Cesar Parra Rancho San Antonio", "Cesar Parra", and "Cesar González Parra" to further his drug trafficking activities. Additionally, it is my belief that GONZALEZ-Parra utilizes his Facebook account to communicate with other known and unknown co-conspirators to facilitate drug trafficking activities in the United States, in the Western District of Virginia and in other Federal Districts.

21. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

22. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

23. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

24. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

25. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

26. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

27. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user, though some of those messages may be able to be recovered from Facebook even after deletion by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

28. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

29. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

30. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

31. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

32. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

33. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

34. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

35. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

37. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

38. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

39. Based on the forgoing, I request that the Court issue the proposed search warrant.

40. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

41. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

*Samantha DeNardis*
Samantha DeNardis
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on ___February 4___, 2019

*Robert S. Ballou*
The Honorable Robert S. Ballou
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF VIRGINIA